[Cite as *Stapleton v. Powers*, 2026-Ohio-1592.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

Byrne C. Stapleton, etc., et al.,               Court of Appeals No. L-24-1299

     Appellees

                                        Trial Court No. CI0202102610

v.

Jerry J. Powers, et al.,                        **DECISION AND JUDGMENT**

     Appellants                              Decided: May 1, 2026

* * * * *

Jay E. Feldstein, for appellee.

Jeremy W. Levy, and
Anthony J. Richardson II, for appellant.

* * * * *

**Zmuda, J.**

## I.      Introduction

{¶ 1} This is an appeal of the judgment of the Lucas County Court of Common Pleas, rejecting claims of ownership by adverse possession advanced by defendants-appellants Jerry J. and Maureen Powers, granting summary judgment in favor of plaintiffs-appellees Byrne C. Stapleton individually and as trustee for the Byrne C.

Stapleton Revocable Trust on the complaint to quiet title and cure encroachment, and awarding attorney fees.[1] Finding no error, we affirm.

## II. Facts and Procedural Background

{¶ 2} Appellants Jerry J. and Maureen Powers ("the Powers") and appellees Byrne C. Stapleton and the Byrne C. Stapleton Revocable Trust ("the Stapletons") own adjoining properties on Forest Lake Drive in Sylvania, Ohio, with the disputed property along the side border between yards, from the street to the waterfront along the back yards. The waterfront had an original timber seawall extending across both properties until the Stapletons erected their concrete seawall just short of the boundary line in 2019. The sprinkler system also predated the parties' respective ownership, installed by the original owner, the Slezaks, in 1995.

{¶ 3} The Stapletons purchased their property in 2003, and in 2005, the Stapletons hired a contractor to erect a fence to enclose their backyard. As evidenced by the surveys for the quiet title action, the contractors mistakenly erected the fence on the Zaharskis' side of the property line, with the exception of one fence post, which extended inches onto the Stapletons' property.[2] The prior owners of the Powers property, the Zaharskis, asked to join their fence to the Stapletons' fence and use the Stapletons' gate; the

---

[1] The parties each filed motions to supplement the record, to add exhibits erroneously omitted from the record filed with the appeal. We grant the motions to supplement the record, and considered the entire record, including the supplemented exhibits, in our decision.

[2] Lauren Stapleton testified at deposition that they obtained permission to install their fence from the homeowners' association, but no records of the application were retained by either the Stapletons or the homeowners' association.

2.

Stapletons consented to the use of their fence. The Zaharskis purchased the property from the Slezaks in 1999, and the Zaharskis sold the property to the Powers in 2009. The Stapletons never met the Slezaks, the original owners.

{¶ 4} Around 2011, the Stapletons removed their fence and installed an Invisible Fence for their dogs. At Jerry Powers' request, Byrne Stapleton agreed to leave in place the portion of the fence that joined to the Powers' property. However, Byrne Stapleton informed Jerry Powers that the fence remained the Stapletons' property. The Powers disagreed and treated the remaining Stapleton fence as their exclusive property. Jerry Powers also began mowing a couple of rows onto the Stapleton property, prompting the Stapletons to ask Powers to stop mowing on their land. The Stapletons also put Invisible Fence flags along the property line to mark the location of the underground wires. Jerry Powers removed the flags more than once, leaving the flags in the Stapletons' landscaping.

{¶ 5} Around the time of the fence removal, the parties had progressed from an uneasy coexistence to a heated boundary dispute. The Stapletons accused the Powers of cutting the wires for their Invisible Fence and pulling out boundary markers. The Powers, in turn, alleged that the Stapletons booby-trapped the property line with stakes, nails, and strings that were rigged to cause damage to their mower or injury to Jerry Powers if he mowed along the boundary. The Powers also accused the Stapletons of spraying chemicals to destroy their landscaping, including landscaping within the disputed area of

3.

property.[3] The dispute between the neighbors eventually escalated to confrontations, resulting in calls to police and a civil protection order petition, with no apparent criminal prosecutions and subsequent withdrawal of the petition for a protection order. Although the Powers ceased mowing over the boundary line in June 2021, the parties continued to dispute ownership of the land along the boundary line.

{¶ 6} In 2020 and 2021, the Stapletons and the Powers each obtained their own surveys to identify the boundary line and resolve the dispute. However, the surveyors agreed on the boundary line, and the surveys demonstrated three encroachments by the Powers onto the Stapleton property: (1) one sprinkler head about a foot over the boundary line; (2) a fence post about four inches over the boundary line; and (3) a timber retaining/breaker wall extending about eight inches beyond the boundary line.

{¶ 7} On July 27, 2021, the Stapletons filed a complaint against the Powers seeking to quiet title to the disputed property pursuant to R.C. 5303.01 and legally determine the exact boundary line dividing the parties' properties, attaching copies of surveys obtained by the parties. The Stapletons also sought relief from the encroachments, identified by the surveys.

{¶ 8} On September 20 and October 7, 2021, the Powers filed pro se pleadings that purported to assert a counterclaim for adverse possession of the disputed property but also alleged tort claims including intentional infliction of emotional distress, assault and battery, nuisance, loss of consortium, and "parasitic damages" and requested dismissal

---

[3] Additionally, the Powers accused the Stapletons of other conduct unrelated to the issue of ownership of the disputed property, including harassment and assault.

4.

and/or summary judgment without clearly addressing the matter as required under the applicable Rules of Civil Procedure. The pro se pleading was comprised of numerous references to defenses or claims, about 120 pages of exhibits including photographs, surveys, and correspondence, and over 60 pages of wide-ranging argument that could be related to defenses or claims. Essentially, the Powers' pleadings did not present any claim or defense as required by the Rules that govern pleadings.

{¶ 9} On November 3, 2021, the Stapletons filed a motion pursuant to Civ.R. 12(E), seeking to clarify the Powers' pleading, noting a response to the pleading in its current form would require their attorney "to expend an unreasonable amount of time and effort to respond to defenses and claims which are not properly pled." The trial court granted the motion under Civ.R. 12(E), directing the Powers to conform to the pleading requirements outlined in the Civil Rules of Procedure, with specific notice of the 20-page limitation on filings, pursuant to the local rule. The trial court further found that, to the extent the Powers' pleading purported to be a motion under Civ.R. 56(C) or 12(B)(6), the motion was denied for failing to satisfy the requirements of those Rules. The trial court ordered the Powers to file a responsive pleading on or before February 22, 2022.

{¶ 10} The Powers obtained counsel, and on February 22, 2022, the Powers filed an answer, acknowledging their adverse interest in the disputed property and denying the Stapleton's ownership of the disputed land. The pleading did not assert a counterclaim. After the Powers' trial counsel withdrew a few months later, the Powers filed a pro se motion to amend the answer to assert a counterclaim for adverse possession, and to include numerous tort claims referenced in their first pro se pleading. The Stapletons

5.

opposed the motion seeking amendment, including opposition to the inclusion of the Powers' numerous tort claims.

{¶ 11} New counsel entered an appearance for the Powers, and the trial court granted the Powers leave to file an amended answer and counterclaim, in part, permitting the additional affirmative defense of laches and limiting the counterclaims to a claim for adverse possession. The Powers filed their amended answer and counterclaim, alleging they and the prior owners of the property "took actual, open, exclusive, continuous and adverse possession of a strip of property" abutting the Stapleton property beginning with the Slezaks' installation of a sprinkler system, erection of a breaker wall, and the planting of bushes and landscaping within the disputed property. After filing their amended pleading, the Powers' second attorney withdrew, and a third attorney entered an appearance for the Powers.

{¶ 12} On February 28, 2023, the Stapletons filed a motion for summary judgment on the complaint to quiet title and cure encroachment. In support, the Stapletons attached numerous exhibits, including documentation for the transfer of ownership of the properties, property surveys, photographs of the survey markers and encroachments, excerpts of deposition testimony of Lauren Stapleton, Byrne Stapleton, and Jerry Powers, and an affidavit of Thomas Slezak, an original owner of the Powers property, attesting to a lack of any dispute over "title or boundaries to the subject property" for the period between the construction of the home in 1995 and the sale of the property to a subsequent owner on June 17, 1999.

6.

{¶ 13} On March 24, 2023, the Powers filed an opposition memorandum to the motion for summary judgment. The Powers did not seek summary judgment on their counterclaim for adverse possession but instead argued that genuine issues of fact remained concerning their adverse possession claim, based on the period of Powers' ownership added to the alleged adverse possession of the Slezaks and the Zaharskis. The Powers presented little evidence to support the claim of adverse possession, limited to documentation of the prior ownership of the properties and Jerry Powers' own affidavit attesting to the adverse possession by the prior owners, with no factual basis for his personal knowledge of the prior owners' conduct in that regard.

{¶ 14} On July 7, 2023,[4] the trial court granted summary judgment in favor of the Stapletons on their claim to quiet title and encroachment. The trial court determined that the Powers owned their property for 11 years, and despite Jerry Powers' affidavit asserting adverse possession by his home's prior owners, his affidavit was not based on firsthand knowledge of the prior owners' use of the disputed property. The trial court further found that the evidence of the Powers' use of the Stapletons' property was insufficient to satisfy the requirements of adverse possession, as the use was confined to "lawn maintenance activities," which, while relevant, required additional evidence to demonstrate open and notorious use. As to the remedy for encroachment, the trial court determined that additional evidence was necessary to determine the appropriate

---

[4] The trial court entered a corrected judgment entry on November 29, 2023, remedying typographical errors and clarifying the Powers' counterclaim for adverse possession was fully litigated through summary judgment.

7.

injunctive relief. The trial court continued the proceedings for additional hearing, finding the grant of summary judgment was not a final order that fully adjudicated the claims.

{¶ 15} On November 20, 2023, the trial court held a trial to determine the injunctive relief on the Stapletons' claim to cure encroachment. At the start of trial, the parties stipulated that the Powers would relocate the sprinkler head at their cost no later than May 15, 2024, and the trial court adopted the parties' stipulation in its judgment, entered on November 29, 2023. As to the fence post, the trial court determined the Stapletons would relocate the encroaching fence post, and the Powers would reimburse the Stapletons in the amount of $550 for the cost of moving the fence post, recognizing that the Stapletons had installed the original fence.

{¶ 16} Finally, the trial court found the expense of replacing the eight-inch span of wooden-block seawall with poured concrete, to match the rest of the Stapletons' existing seawall, would be an unnecessary expense because the wooden blocks served the same function as the concrete seawall and no party complained about the aesthetics of a combination wall. The trial court ordered the fence post at the seawall to remain with the wooden blocks to mark the "juncture of the seawalls of the respective property owners." [5] The trial court ordered Powers to abandon and relinquish all control and dominion over

---

[5] On December 28, 2023, the Stapletons filed a motion to show cause, alleging the Powers removed the fence, including the fence post at the seawall. The Powers replaced their seawall with a new concrete seawall, and the Stapletons claimed the removal of the post and replacement of the Powers' seawall caused the wooden blocks to collapse. The trial court denied the motion to show cause, after hearing, noting the evidence did not demonstrate a link between the collapse and the Powers' installation of their concrete seawall.

8.

the approximately eight-inch span of wooden blocks between the parties' seawalls, finding these wooden blocks to be the Stapletons' property. After addressing the remedy for encroachment, the trial court continued the matter, once more, for determination of the Stapletons' request for attorney fees, finding the decision of November 29, 2023, did not constitute a final order.

{¶ 17} On December 15, 2023, the Stapletons filed an application for attorney fees, seeking attorney fees for the Powers' pro se filings in 2022, alleging bad faith, vexatious, wanton, and obdurate conduct and citing R.C. 2323.51. The trial court held a hearing on May 17, 2024, and counsel for the Powers stipulated to the reasonable, hourly fee charged by Stapleton's counsel. Following hearing on the motion, the Stapletons' filed an amended application on May 31, 2024. On July 10, 2024, the trial court granted the Powers' third attorney leave to withdraw from the case, and the Powers proceeded pro se for the remainder of the proceedings. The Powers filed a series of pro se motions, including the following:

> July 29, 2024, the Powers filed a pro se motion to dismiss the amended application for attorney fees, requesting an award of attorney fees and punitive damages against the Stapletons for bad faith. The filing was over 700 pages with 690 pages of exhibits, and accused the Stapletons' counsel of misconduct, including conspiring with others to submit false affidavits to the court.

> August 7, 2024, the Powers filed a pro se motion to vacate judgment under Civil Rule 60(B) and for reconsideration, seeking to set aside the interlocutory decision on summary judgment. The filing was over 200 pages and included 186 pages of exhibits and an accusation against Byrne Stapleton and his trial counsel of paying another attorney to sign a false affidavit to extort money from the Powers.

9.

August 16, 2024, the Powers filed their witness list for hearing and request for continuance of the hearing of August 23, 2024. This filing was 68 pages with 40 pages of exhibits, and alleged, among other claims, that Byrne Stapleton and his "rogue attorneys" intentionally and willfully planned "to carry out deceit with fraudulent affidavit to try to extort money from the Powers."

August 22, 2024, the Powers filed a motion to strike all applications for attorney fees and a motion to dismiss the Stapletons' claims for failure to state a claim, motion for new trial, and motion to vacate judgment. This filing was 21 pages and reiterated accusations of the Stapletons "escalating violence" and causing "physical harm" despite the fact they had no tort claims pending against the Stapletons.

September 3, 2024, the Powers filed a corrected version of the motion filed August 22, 2024 with a motion for attorney fees that duplicated another earlier filing. This filing was 361 pages long, of which 340 pages were exhibits.[6]

{¶ 18} The trial court held additional hearings on the application for attorney fees on August 23, 2024, and November 4 and 6, 2024. At the close of evidence, counsel for the Stapletons argued additional fees and expenses were incurred from May 31 through October 25, 2024, again alleging the Powers engaged in the same bad faith and vexatious conduct during that five-month period that was alleged to occur relative to the Powers' 2022 filings. In response, the trial court noted the Powers had no defense for the conduct, concluding the Powers "meant to make Stapletons' life miserable, embarrass and impugn Mr. Stapleton's character and prejudice the reader against him."

{¶ 19} In its final judgment on November 14, 2024, the trial court granted the Stapletons' application for attorney fees as to the Powers' filings in 2022 and for the

---

[6] The trial court listed additional pro se filings that it found represented bad faith and vexatious and oppressive conduct.

"onslaught of filings" from July 29 through September 12, 2024. The trial court found that the 2022 filings were in bad faith, vexatious, and oppressive. In a footnote, the trial court determined that addressing the application for attorney fees under R.C. 2323.51(B)(1) would yield the same result. The trial court awarded the Stapletons attorney fees in the amount of $12,128.24 for the 2022 filings. The trial court also determined that the Powers' filings for the period in 2024 were also in bad faith, vexatious, obdurate, and oppressive. The trial court awarded the Stapletons attorney fees and expenses for the 2024 filings in the amount of $18,430.00. The trial court's total judgment for attorney fees and expenses was entered in favor of the Stapletons and against the Powers, jointly and severally, in the amount of $30,558.24. With all claims adjudicated,[7] the trial court entered final judgment.

{¶ 20} The Powers filed a timely appeal of the judgments granting summary judgment, ordering injunctive relief, and awarding attorney fees.

### III.    Assignment of Error

On appeal, the Powers assert the following assignments of error:

(1) The trial court committed reversible error by granting summary judgment against appellants, where undisputed facts support that summary judgment should have been granted in [appellants'] favor.

(2) The trial court committed reversible error by granting summary judgment where there must be genuine issues of material fact.

---

[7] In addition to addressing attorney fees, the trial court also addressed the Powers' various motions, carefully construing the motions to address the substance of the filing and explaining the court's denial of each motion.

(3) The trial court committed reversible error by granting an award of $550 to appellees, because appellees were responsible for the [encroachment] and equity commands they must be estopped.

(4) The trial court committed reversible error by awarding attorney fees to [appellees] where appellants acted reasonably to protect their interest and not to oppress or cause distress.

## IV.    Analysis

### A. Summary Judgment

{¶ 21} In the Powers' first and second assignments of error, they challenge the trial courts' determination on summary judgment. We review the trial court's summary judgment decision de novo. *Marcum v. Ellis,* 2020-Ohio-2763, ¶ 23 (6th Dist.), citing *Grafton v. Ohio Edison Co.,* 77 Ohio St.3d 102, 105 (1996). Summary judgment is proper where, after construing the evidence in favor of the nonmoving party, there are no genuine issues of material fact and reasonable minds can reach only one conclusion, that the moving party is entitled to judgment as a matter of law. *Marcum* at ¶ 23, citing Civ.R. 56(C); *Lopez v. Home Depot, USA, Inc.,* 2003-Ohio-2132, ¶ 7 (6th Dist.).

{¶ 22} In seeking summary judgment, the moving party has the burden of producing evidence, as identified in Civ.R. 56(C), on the essential elements of the party's claim. *Dresher v. Burt,* 75 Ohio St.3d 280, 293 (1996). If the moving party satisfies this initial burden, the burden shifts to the nonmoving party to set forth facts in accordance with Civ.R. 56(E) that demonstrate a genuine issue for trial. *Id.*

{¶ 23} In this case, the Stapletons brought an action to quiet title to the disputed property and cure any encroachments to their land. "[A] person in possession of real property may bring an action to quiet title under R.C. 5303.01." (Citation omitted) *Huron* 12.

*v. McCune,* 2023-Ohio-575, ¶ 21. In a quiet-title action, a plaintiff must present evidence as to all essential allegations in the complaint and prove title in himself if the answer denies his title or the defendant claims title by adverse possession. *Ochsenbine v. Village of Cadiz,* 2005-Ohio-6781, ¶ 13 (7th Dist.), citing *Duramax, Inc. v. Geauga Cty. Bd. of Commrs.,* 106 Ohio App.3d 795, 798 (11th Dist.1995).

{¶ 24} The Powers, in response to the quiet title action, asserted ownership of the disputed strip of land based on adverse possession. "Under the doctrine of adverse possession, a [claimant] can acquire legal title to another's real property if he or she proves exclusive possession and open, notorious, continuous, and adverse use for a period of 21 years." *Huron* at ¶ 27, citing *Houck v. Bd. of Parks Commrs. of the Huron Cty. Park Dist.,* 2007-Ohio-5586, ¶ 10 (additional citation omitted). Powers asserted he and his predecessors' use of the disputed property satisfied the 21-year period necessary to acquire title.

{¶ 25} The evidence proffered by the parties for summary judgment demonstrated no dispute regarding the property survey, showing the Stapletons' held title to the disputed land. The Stapletons' also presented evidence showing the Powers had not possessed the disputed land for 21 years. Because adverse possession is not a "favored means to acquire property[,]" a claimant must prove, "by clear and convincing evidence that his possession of the disputed land was open, continuous, exclusive, adverse, and notorious to that of the record owner for a period of [21] years." *Franck v. Young's Suburban Estates, Inc.,* 2004-Ohio-1650, ¶ 19 (6th Dist.), citing *Grace v. Koch,* 81 Ohio St.3d 577 (1998), at the syllabus (additional citations omitted.).

13.

{¶ 26} In arguing issues of fact concerning ownership of the disputed land by adverse possession, the Powers acknowledged that they had not been in possession of their property for the requisite time, and generally claimed their predecessors had exercised ownership of the disputed property based on the existence of the seawall and the sprinkler system, installed at the time the homes were constructed in the 1990s. The affidavit of Jerry Powers, furthermore, asserted the prior owners maintained the disputed property "upon information and belief," with nothing within his affidavit demonstrating a basis for his information or belief. Finally, the Powers argued that Byrne Stapleton's deposition testimony created issues of fact regarding the prior owners' maintenance of the disputed property, but Byrne Stapleton's testimony disputed any "maintenance" by prior owners for 21 years, as the Stapletons did not acquire their property until 2003, less than 21 years before they filed suit.

{¶ 27} On appeal, the Powers now argue that summary judgment should have been granted in their favor, sua sponte, relying on the Slezaks' installation of the sprinkler system more than 21 years before the Stapletons' suit and the failure of any subsequent owners to dispute the boundary based on placement of the sprinkler head over the surveyed boundary and the subsequent encroachments, all demonstrating a lack of knowledge of the actual boundary line. In essence, the Powers argue that summary judgment was appropriate in their favor on their claim for adverse possession because the record demonstrated more than 21 years of implied acceptance of the disputed boundary line. However, of the encroachments upon which the Powers rely, only the sprinkler head was arguably in place the requisite 21 years.

14.

{¶ 28} Adverse possession is based on the use of the disputed property and not the parties' implied belief on the location of the boundary line. It is the visible and adverse aspects of the possession that permit an adverse possession claim, and "[t]he occupancy must be such as to give notice to the real owner of the extent of the adverse claim." *Grace v. Koch,* 81 Ohio St.3d 577, 581 (1998), quoting *Humphries v. Huffman,* 33 Ohio St.395, 402-404 (1878). Thus, the adverse possessor "must unfurl his flag on the land, and keep it flying so that the owner may see, if he will, that an enemy has invaded his dominions and planted his standard of conquest." *Grace* at 581, quoting *Darling v. Ennis,* 415 A.2d 228, 230 (Vt.1980); *Philbin v. Carr,* 129 N.E.19, 30 (Ind.App.1920).

{¶ 29} In his deposition, Byrne Stapleton testified that the seawall was a continuous, timber construction until he installed a concrete seawall in 2019. As to maintenance of the seawall by prior owners, he testified there was nothing to "maintain," stating, "I don't know what you would define as maintain, it's a wall." Byrne Stapleton also testified regarding the sprinkler head, noting it was not visible unless it was in use. He testified that he knew the Zaharskis used the sprinkler system, but the sprinkler heads disappeared into the grass when the system was not in use, and he only discovered the one sprinkler head on his property, by accident, when he cut into it while planting bushes along the property line.

{¶ 30} The Powers did not move for summary judgment on their claim of adverse possession in the trial court. However, the trial court necessarily addressed the claim in its summary judgment decision, as judgment in favor of the Stapletons could only be granted if there were no remaining issues in dispute concerning adverse possession. The

15.

Powers presented no evidence of adverse use of the property for the required 21 years, with no evidence or authority to support the contention that a single sprinkler head, inches over the boundary line, was sufficient to support adverse possession of the entire strip of disputed property.

{¶ 31} The trial court determined that the sprinkler head was part of "lawn maintenance activities," which, standing alone, did not establish open and notorious use. "[It] is not obvious that mowing grass and trimming bushes are adverse acts[,]" without installation and use of a permanent structure or improvement. *NC Enterprises, L.L.C. v. Norfolk & W. Ry. Co.,* 2026-Ohio-1429, ¶ 23. Furthermore, there was no evidence demonstrating the sprinkler head was part of the original sprinkler system or that it had been present in that location for more than 21 years. The trial court further determined that the sprinkler head was not open and obvious, and so did not place the Stapletons on notice of a claimant to their property.

{¶ 32} While we found no Ohio cases considering the open and obvious nature of a single sprinkler head, the Ohio Supreme Court recently reiterated that "a 'secret trespass' is not open and notorious[,]" and "when the 'occupation [is] under the surface,' it is not open and notorious." (Citations omitted) *NC Enterprises* at ¶ 20.

{¶ 33} Other jurisdictions have determined sprinkler heads lack the required visibility to "be sufficiently notorious to give notice to the record owner that his title or ownership is in danger so that he may, within the period of limitation, take action to protect his interest." *Poullos v. Pine Crest Homes, LLC,* 293 Neb. 115, 120-121 (2016) (underground sprinkler systems, which are "ubiquitous in residential neighborhoods" are

16.

not visible and conspicuous); *see also Mullins v. HD/MW Randolph Ave., LLC,* 2017 WL 1317494, *10 (Mass.Land Ct. Apr. 6, 2017) (placement of a sprinkler head that "evades easy notice" does not satisfy open and notorious element for adverse possession). Even presuming the sprinkler head was the same one initially installed with the sprinkler system by the Slezaks, the evidence before the trial court on the issue demonstrated a single sprinkler head that "evades easy notice" and was discovered by Byrne Stapleton only after he dug in the area to plant bushes.

{¶ 34} Therefore, construing the record in the Powers' favor, we find no genuine issues of fact remain regarding the Stapletons' ownership of the disputed land and the lack of all necessary elements to demonstrate acquisition by adverse possession. There is no dispute that the surveys obtained by both parties demonstrate the Stapletons' ownership and the encroachment at the seawall, the one fence post, and the one sprinkler head, inches over the boundary line. Furthermore, while the Powers did obtain an affidavit from Thomas Slezak, it was limited to an attestation regarding the lack of a property dispute and did not demonstrate adverse use of the disputed land by the Slezaks. Finally, the testimony of Byrne Stapleton regarding the accidental discovery of the sprinkler head was unrefuted, with no evidence demonstrating the sprinkler heads were sufficiently visible to place the Stapletons on notice of an open and notorious incursion on their property.

{¶ 35} Accordingly, while title by adverse possession may arise from mutual mistake regarding a boundary without an intent to adversely possess, there must still be proof of "actual, continuous, notorious and exclusive possession up to a certain line" for

17.

the required 21-year period. *Franck,* 2004-Ohio-1650, at ¶ 22*,* citing *Yetzer v. Brinker,* 17 Ohio St.3d (1866), at the syllabus. Considering this record, the Powers failed to proffer evidence demonstrating genuine issues of fact regarding their claim for adverse possession, and the trial court properly entered summary judgment in favor of the Stapletons on their claim to quiet title and cure encroachments.

{¶ 36} Therefore, the Powers' first and second assignments of error are not well-taken.

### B. Encroachment

{¶ 37} In their third assignment of error, the Powers challenged the trial court's award of $550 to the Stapletons to compensate the Stapletons for relocation of the fence post by a professional. In response, the Stapletons argued this issue is moot because Jerry Powers removed the post at his own cost and therefore paid nothing to the Stapletons to cover the cost of professional removal. The Stapletons did not object to the removal and did not seek payment of $550. Essentially, the Stapletons wished to have the fence post removed, the judgment would have placed the cost of removal on the Powers, and both things have been accomplished through Powers' action.

{¶ 38} Therefore, we agree that the Powers' third assignment of error seeks review of a moot issue. Issues on appeal are moot, "when they are or have become fictitious, colorable, hypothetical, academic or dead; the distinguishing characteristic of such issues is that they involve no actual genuine live controversy, the decision of which can definitely affect existing legal relations." *PR Transp., Inc. v. McClure,* 2010-Ohio-1364, ¶ 8 (6th Dist.), quoting *In re L.W.,* 2006-Ohio-644, ¶ 11 (10th Dist.). Based on these

18.

circumstances, no live controversy remains regarding the fence post, rendering the issue moot. Therefore, we decline to address the Powers' third assignment of error, finding the issue is moot.

### C. Attorney Fees

{¶ 39} In their fourth and final assignment of error, the Powers challenge the trial court's award of attorney fees and expenses in the amount of $30,558.24, arguing the American Rule should apply and the Powers acted reasonably in representing themselves for portions of the proceedings. The Powers argue that the trial court applied "an imaginary common law 'exception' to the American rule" and an award of attorney fees was also not merited under R.C. 2323.51. Finally, the Powers argued that the hourly rate awarded by the trial court was excessive.

{¶ 40} In response, the Stapletons argue that the bad faith exception does apply in this case, and the Powers admittedly acted in bad faith with an aim to embarrass Byrne Stapleton, impugn his character, and force a settlement. In the alternative, the trial court also noted that an analysis under R.C. 2323.51(B)(1) would produce the same award of attorney fees, based on frivolous conduct. As to the hourly rate, the Stapletons noted that the Powers stipulated to the reasonableness of the hourly rate, through counsel, in their brief in opposition to the Stapletons' application for attorney fees and expenses, with only the number of hours required to respond to the Powers' pro se pleadings disputed.

{¶ 41} An award of attorney fees is proper in limited circumstances. Applying the "American rule," attorney fees may not be awarded a prevailing party in a civil action. *Waldock v. Waldock Invest. Co.,* 2025-Ohio-872, ¶ 21 (6th Dist.), quoting *Wilborn v. Bank* 19.

*One Corp.,* 2009-Ohio-306, ¶ 7 (additional citations omitted.). As one of the exceptions to the rule, attorney fees may be awarded "when the prevailing party demonstrates bad faith on the part of the unsuccessful litigant." *Waldock* at ¶ 21, quoting *Wilborn* at ¶ 7, citing *Pegan v. Crawmer,* 79 Ohio St.3d 155, 156 (1997).

{¶ 42} "We review a trial court's determination 'with respect to a request for attorney fees on the basis of bad faith for an abuse of discretion.'" *Waldock* at ¶ 26, quoting *Bodenstein v. Richard Aloisio Trucking, Inc.*, 2020-Ohio-3761, ¶ 25 (12th Dist.). An abuse of discretion means the trial court acted unreasonably, arbitrarily, or unconscionably. *Waldock* at ¶ 26, citing *State ex rel. Beacon J. Pub v. Akron Metro. Hous. Auth.,* 42 Ohio St.3d 1, 203 (1989). Our review under an abuse of discretion standard is deferential, as "a reviewing court is not free to merely substitute its judgment for that of the trial court." *Id.,* quoting *Jeter v. Kruz 'N' Kleen,* 2023-Ohio-4165, ¶ 11 (6th Dist.) (additional citation omitted.).

{¶ 43} First, the Powers argue that an award of attorney fees is limited to those fees authorized by statute, applying the "American rule." This argument misstates the applicable law. While Ohio applies the "American rule" to an award of attorney fees, "there are three well-established exceptions to the American rule: (1) when a statute creates a duty to pay attorney fees, (2) when the losing party acted in bad faith, and (3) when the parties contracted to shift the fees." *Cruz v. English Nanny & Governess School,* 2022-Ohio-3586, ¶ 36, citing *Wilborn v. Bank One Corp.,* 2009-Ohio-306, ¶ 7.

{¶ 44} In this case, the trial court considered the second exception, bad faith by the losing party, in addition to noting that analysis under R.C. 2323.51 was also appropriate

20.

and yielded the same award of attorney fees. An award of attorney fees based on bad faith has long been permitted as part of compensatory damages. *Cruz* at ¶ 37, citing *Roberts v. Mason,* 10 Ohio St. 277 (1859), syllabus. In determining the amount of fees to award, courts apply the lodestar calculation, "the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Cruz* at 47, quoting *Bittner v. Tri-County Toyota, Inc.,* 58 Ohio St.3d 143, 145 (1991) (additional citation omitted.).

{¶ 45} Prior to awarding attorney fees, the trial court held a hearing over several days. At the first hearing, counsel for the parties stipulated to the reasonable hourly rate. After the hearing held on March 14, 2024, the Powers represented themselves. The Stapletons presented expert testimony to support their motion for attorney fees, limiting their request to those fees incurred in addressing the Powers' pro se filings.

{¶ 46} As noted by the trial court, the Powers continually attempted to argue the quiet title action or their withdrawn tort claims at the hearing, and they acknowledged the voluminous filings and attacks on Mr. Stapleton's character, as well as the accusations against counsel in the case, both their own and the Stapletons' counsel. The trial court summed up the evidence at hearing as follows:

> Plaintiffs' evidence included other insults and derogatory statements that Powers' filings contained about Stapleton, accusing him of hate crimes against the elderly, characterizing him as immoral and lacking integrity, committing perjury, fraud, and misinformation, and describing him as being – with [Powers' former attorney] and [Stapleton's attorney] – in an illegal collusion, "a cabal" or civil conspiracy against the Powers. They accuse them of trying to ruin the Powers' finances and extort money from him.

> The evidence at hearing on 5/17/24, 8/23/24, and 11/4/24 through 11/6/24 established Defendants' bad faith, vexatious and obdurate conduct

and that the filings were made for oppressive purposes. All of Defendants' filings and their excessive length and obnoxious content necessitated Plaintiffs incurring additional amount of attorney fees and expenses for their legal services in response.

As to Defendants' lengthy filings, during the latter hearings Mr. Powers claimed they were unaware of Local Rules' 20-page limitation for filings but in fact this Court instructed Defendants about the 20-page limitation in its Order of 1/29/22. … Notwithstanding that Court Order, Defendants continued filing documents well in excess of 20 pages and they continued padding their fillings with voluminous, unnecessary exhibits.

{¶ 47} In challenging this award, the Powers argue that an award of attorney fees for asserting a "passionate and very wordy" defense was not warranted. Instead, the Powers argue that the Stapletons demonstrated an unwillingness to resolve the case and chose using the legal process "to oppress" the Powers through show cause hearings and their trial counsel's "eager and overzealous" conduct in increasing fees by addressing the filings they claimed were frivolous and meritless. In arguing "overzealous" conduct by the Stapletons' counsel, the Powers appear to argue that the Stapletons' counsel spent an unreasonable number of hours addressing their "frivolous" filings, while also maintaining that those filings were not frivolous. Finally, the Powers wholly ignore their counsel's stipulation as to the reasonable rate, and instead, they challenge that rate as excessive for the first time on appeal.

{¶ 48} Contrary to the Powers' position, the record supports the trial court's findings. The Powers' filings were voluminous and understandably time-consuming to review. Furthermore, the Powers' claim that Stapletons' counsel failed to mitigate the amount of attorney fees in reviewing those filings ignores the duty of reasonable diligence that counsel owed to the Stapletons, the client. *See* Prof.Cond.R. 1.3 (requiring

22.

a lawyer to act with reasonable diligence in representing a client). A failure to review case documents and communicate with the client regarding the information contained therein could subject counsel to sanctions. *See Cleveland Metropolitan Bar Assn. v. Perry,* 2019-Ohio-764, ¶ 13 (failure to review documents and inform client regarding contents violated Prof.Cond.R. 1.3). Accordingly, the Powers' oblique challenge to the number of hours expended by the Stapletons' counsel in addressing their pro se filings is without merit.

{¶ 49} In addition to the time required to review their filings, the Powers acknowledged at hearing that their strategy in filing was to prove their case without the need for trial and to force the Stapletons to settle without a trial. The trial court noted that this strategy made litigation "unnecessarily more burdensome, time-consuming and expensive," as demonstrated by the Stapletons' evidence. Thus, the trial court determined an award of attorney fees for bad faith, or in the alternative, frivolous conduct, was appropriate.

{¶ 50} "Bad faith has been defined as 'a dishonest purpose, moral obliquity, conscious wrongdoing, breach of a known duty through some ulterior motive or ill will partaking of the nature of fraud [or an] actual intent to mislead or deceive.'" *Waldock,* 2025-Ohio-782, at ¶ 27 (6th Dist.), quoting *State ex rel. Cleveland Assn. of Rescue Emps. V. The City of Cleveland,* 2023-Ohio-03112, ¶ 32 (additional citation omitted.). Furthermore, bad faith can involve both pre-suit conduct and conduct during litigation. *Id.,* citing *Becker v. Direct Energy, LP,* 2018-Ohio-4134, ¶ 109 (2d Dist.). Upon

23.

reviewing the record, we find no abuse of discretion by the trial court in awarding attorney fees based on bad faith for the Powers' pro se filings.

{¶ 51} Finally, we find no error by the trial court in applying the stipulated hourly rate to the hours expended in responding to the pro se filings. The Powers failed to challenge the rate or the hours used by the trial court in its calculation and raise this issue for the first time on appeal. By failing to raise the argument in the trial court, the Powers forfeit this argument in the appeal. *See Waldock* at ¶ 25.

{¶ 52} Accordingly, finding no abuse of discretion in the award of attorney fees, which are permitted under the bad faith exception to the American rule, we find the Powers' fourth assignment of error not well-taken.

## V.     Conclusion

{¶ 53} The judgment of the Lucas County Court of Common Pleas is affirmed. The Powers are ordered to pay the costs of the appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See also 6th Dist.Loc.App.R. 4.

24.

Christine E. Mayle, J.
_____
                     JUDGE

Gene A. Zmuda, J.
_____
                     JUDGE

Charles E. Sulek, J.
CONCUR.
                     JUDGE

This decision is subject to further editing by the Supreme Court of
Ohio's Reporter of Decisions.  Parties interested in viewing the final reported
version are advised to visit the Ohio Supreme Court's web site at:
http://www.supremecourt.ohio.gov/ROD/docs/.